IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

DANILYN D. SIZEMORE,
      Plaintiff,

vs.                                          Case No. 3:04cv91/RV/EMT

JO ANNE B. BARNHART,
Commissioner of the
Social Security Administration,
Defendant.

_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act and for supplemental security income ("SSI") benefits under Title XVI of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.      PROCEDURAL HISTORY

      Plaintiff filed an application for DIB on January 18, 2001 and for SSI benefits on February

7, 2001, alleging an onset of disability of August 1, 2000 in each (Tr. 50-52, 336-39).[1]  The applications were denied initially (Tr. 25-26, 29-30, 340-43) and on reconsideration (Tr. 27-28, 33-34, 344-48).  On September 4, 2001, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 35-36).  A hearing was held on April 23, 2002 (Tr. 349-87).  Plaintiff was represented by counsel and testified (Tr. 359-87).  On August 16, 2002, the ALJ rendered a decision denying Plaintiff's applications for benefits (Tr. 8-22).   The Appeals Council denied review (Tr. 5-6).   The Appeals Council's action made the ALJ's decision the final decision of the Commissioner, and therefore subject to review in this court.  Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998).  Plaintiff's appeal from the final decision of the Commissioner is now before this court.

II.   FINDINGS OF THE ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability (Tr. 21) and that Plaintiff had severe impairments including high blood pressure, arthritis and knee problems, but did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404; Subpart P, Appendix 1 (id.).  The ALJ determined that Plaintiff could not return to her past relevant work as a certified nursing assistant, but that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work.  In reaching this conclusion, the ALJ found that Plaintiff's "allegations regarding her limitations are not credible to the extent all work activity would be precluded" (id.).  No vocational expert ("VE") testified at Plaintiff's hearing; instead, the ALJ relied upon the "grids" (i.e., the Medical-Vocational Guidelines, Rule 201.27, Table No. 2 of Appendix 2, Subpart P, Regulation No. 4) which directed a finding of not disabled.  Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act (Tr. 21-22).

III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) (stating "[t]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by

---

[1] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on June 24, 2004 (Doc. 10).

substantial evidence or that proper legal standards were not applied"); *see also* Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). The Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, i.e., "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do previous work, "but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps. The steps are:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. §§ 404.1512, 416.912.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

A.      Personal History

Plaintiff was born on April 7, 1963 (Tr. 50).  She is a high school graduate (Tr. 12, 72, 360) and has previous work experience as a certified nursing assistant ("CNA") (Tr. 12, 67, 369). Plaintiff testified at her hearing before the ALJ as follows.  She is married and lives with her husband and twelve year old son in a mobile home (Tr. 361-62). She is 5'2", weighs 165 pounds, and is right-handed (Tr. 362, 364).  No particular event caused her disability; rather, her problems arose gradually over time and her "knee just got to where [she] just was unable to work with it" (Tr. 366).  In addition to problems with her left knee, Plaintiff asserts disability based upon high blood pressure and arthritis (Tr. 366, 369).  She testified she had three surgeries on her left knee (see Tr. 366-68) and none have been successful (Tr. 368), although the third one provided some relief (Tr. 380).  The first surgery was in August 2000, and coincides with Plaintiff's onset of disability; the second, an exploratory surgery, was in April 2001; and the third was in July 2001 (Tr. 366-68). Plaintiff was on crutches from August 2000 to January 2002, and "unable to weight bear" until January 2002, when she was prescribed a cane (Tr. 380).  She testified that uses the cane "all the time," except when she is sleeping (Tr. 360).  Plaintiff participated in physical therapy after her third surgery for approximately four to five weeks, but stopped when her insurance would no longer pay for the therapy.  She was instructed to try home exercises and made some progress doing so (Tr. 381).  At various times, Plaintiff took medications including Relafen, Vioxx, and Plaquenil, which

provided relief initially, but wore off over time (Tr. 382).  She testified she can sit for only forty-five minutes to an hour and then experiences "extreme pain" (i.e., she describes her pain as an eight on a scale of one to ten) and has to elevate her leg to "at least heart level" in an effort to relieve the pain (Tr. 384).  On a daily basis, Plaintiff goes to her mother's house with her son, because her sister lives nearby, their children attend the same school, and Plaintiff's sister takes the children to school.  She stays at her mother's house doing nothing all day, "just basically sitting around the house," until her son returns from school and then they both go home (Tr. 371-72).  Plaintiff is able to drive, and drives approximately twenty-five miles per week, but cannot grocery shop by herself.  She takes her husband grocery shopping with her and rides around in a self-propelled cart (Tr. 372); she can reach grocery items at eye-level and can put groceries on the conveyer belt to check out, but cannot carry the groceries (Tr. 373).  She has eight steps leading to the front door of her mobile home, but has difficulty climbing them because of her knee (Tr. 375).  She can vacuum only if she is having "a good day," and then only because her living room is small and her vacuum is self-propelled (Tr. 376).  She cannot do laundry without her son's assistance carrying the laundry to the machine, sorting it, and putting it into the washing machine for her.  He takes the laundry out of the dryer and then Plaintiff is able to fold it (*id.*).  She is unable to sweep or mop, and can cook only if it is food that does not have to be continuously watched (*id.*).

B.      Relevant Medical History

*Reports from William Wilson, M.D.*[2] - Plaintiff first saw Dr. Wilson on July 24, 1997.  He diagnosed her with hypertension and prescribed medication (Tr. 263).  He next saw her on September 16, 1997, and noted her elevated blood pressure (Tr. 260).  Plaintiff complained of shortness of breath and an inability to take the medication prescribed in July (*id.*).  Her medication was adjusted, but she returned three days later complaining of adverse side effects from the newly prescribed medication (Tr. 255).  Dr. Wilson adjusted her medication again and performed an EKG in his clinic, which revealed a "normal sinus rhythm"(*id.*).  Plaintiff was referred for x-rays (*id.*), which were taken on September 24, 1997, and revealed "no radiographic evidence of active cardiopulmonary disease" (Tr. 252, 259).  Plaintiff returned on September 30, 1997, with elevated

---

[2] Dr. Wilson was Plaintiff's primary care physician.  His records cover approximately four years of treatment, from July 24, 1997, to May 15, 2001 (Tr. 164-263).  Only the relevant portions of Dr. Wilson's records are discussed in this Report and Recommendation.

blood pressure. She was advised to adjust her diet, and that doing so should lower her cholesterol and help her lose weight (Tr. 251). Plaintiff returned on October 21, 1997 (Tr. 250). In addition to hypertension, at that time she complained of esophageal spasms (*id*). She next saw Dr. Wilson on November 21, 1997, and complained of abdominal pain, for which she was referred to Dr. Speer (Tr. 247). At that time, Dr. Wilson noted that Plaintiff's hypertension was "well-controlled" (*id*).

Plaintiff saw Dr. Wilson on April 6, 1998, after her release from Baptist Hospital, where she had been hospitalized for chest pain. Plaintiff advised that she was still experiencing chest pain and that the pain radiated into her left arm. Dr. Wilson recommended a stress test and opined that Plaintiff should not return to work full-time, as "99% of her work [as a CNA] is physical in nature and seems to aggravate her condition" (Tr. 223).

In April 2002, Dr. Wilson opined that Plaintiff "should not work due to multiple medical problems which include Rheumatoid arthritis, fibromyalgia, Reiter's syndrome, significant hypertension, [and] COPD [chronic obstructive pulmonary disease]" (Tr. 318).

Dr. Wilson completed a Physical Capacities Evaluation on May 3, 2002 (Tr. 334-35). He opined that Plaintiff could work only one hour in an eight-hour work day; occasionally lift up to five pounds, but never carry that amount; that she could never grasp with her left or right hand; never push or pull; had no capacity for fine manipulation; could never bend, squat, crawl, or climb (Tr. 334); and that she could be expected to miss more than 25-30 days of work per year (Tr. 335).

*Medical Report from Carl Speer, M.D.* - Upon referral from Dr. Wilson, Dr. Speer evaluated Plaintiff on or about December 5, 1997, for abdominal pain, heartburn and indigestion. Plaintiff was prescribed Prilosec and Dr. Speer planned to reevaluate Plaintiff in two months, after receiving the results of an upper GI series (Tr. 106). The record does not show that Plaintiff returned to Dr. Speer.

*Records from Baptist Hospital* - Plaintiff was admitted to Baptist Hospital ("Baptist") on March 23, 1998, complaining of chest pain. The doctors concluded that Plaintiff had poorly controlled hypertension and, in light of her complaints of chest pain, an echocardiogram was done. It had normal results and Plaintiff was discharged two days later in stable condition (Tr. 107-10).

Plaintiff returned to the emergency room ("E.R.") via ambulance on March 26, 1998, complaining of "shortness of breath," chest pain, and tingling in her fingers (Tr. 111). She was again diagnosed with hypertension and was advised to follow up with Dr. Wilson.

On April 1 and April 9, 1998, at Dr. Wilson's request, Plaintiff underwent stress tests at

Baptist (Tr. 222, 225).  During the first test, no ischemic EKG changes or arrhythmias were detected, and Plaintiff did not experience chest pain (Tr. 225).  On the second test, chest discomfort and shortness of breath were noted, but Plaintiff had "normal left ventricular function [and] no evidence of ischemia or infarction" (Tr. 222).

Plaintiff was again admitted to Baptist on December 30, 1999, coughing and complaining of shortness of breath.  She was discharged three days later and diagnosed with bronchial pneumonia, hypertension, and "asthma without statis" (Tr. 119).

*Treatment notes from Brent Videau, M.D.* - Upon referral from Dr. Wilson, Dr. Videau saw Plaintiff on February 27, 1998, and diagnosed her with poorly controlled hypertension (Tr. 118). He prescribed Provera and suggested that she return in six weeks for a followup visit (*id.*).

Dr. Videau saw Plaintiff again on April 30, 1998, on referral from Dr. Wilson, who requested that Dr. Videau discuss the possibility of a "cardiac cath" with Plaintiff because of Plaintiff's multiple visits to the E.R. and recurrent chest pain.  Plaintiff and Dr. Videau discussed the implications of having a cath done and decided to "discuss it further" due to Dr. Videau's belief that Plaintiff had an extremely low risk of cardiovascular disease (Tr. 116).

*Treatment notes from James T. Stringfield, III, M.D.* - Upon referral from Dr. Wilson, Dr. Stringfield saw Plaintiff in April 1998 for "pulmonary complaints" (Tr. 127).  Plaintiff complained of "shortness of breath" and explained that she had been to the E.R. twice and was advised that she needed to control her hypertension.  Plaintiff told Dr. Stringfield that she is able to do housework, but it leaves her short of breath (*id.*).  Dr. Stringfield diagnosed her with uncontrolled hypertension, shortness of breath (possibly secondary to hypertensive heart disease), chest pain (etiology undetermined), and acid regurgitation (Tr. 129).  He found "no good evidence of primary pulmonary disease," and suggested a desire to determine the cause of her dyspnea (i.e., her shortness of breath) (*id.*).

Plaintiff next saw Dr. Stringfield in May 1998.  She complained of dyspnea, but her heart and lungs revealed no abnormalities (Tr. 125).  He thought she had a "little bit of pulmonary function abnormality," but did not believe this adequately explained her shortness of breath (*id.*). He prescribed an inhaler and noted that her blood pressure was still significantly elevated and that she may need additional therapy (*id.*).

Plaintiff saw Dr. Stringfield again on January 10, 2000, after her discharge from Baptist.  She

was still coughing and again complained of dyspnea (Tr. 123), although she advised she was capable of doing housework and could walk on a treadmill for ten minutes (*id.*).  Dr. Stringfield opined that Plaintiff had suffered from a pulmonary infection, but was no longer infected.  He wished to review Plaintiff's chest x-rays and asked that she return to see him in seven to ten days (Tr. 123-24).  The record does not reflect that Plaintiff returned to Dr. Stringfield.

*Radiology Consultations* - At Dr. Wilson's request, four x-rays were taken of Plaintiff's left knee on June 7, 2000.  A possible torn ligament was observed, but could not be definitively diagnosed without an MRI (Tr. 185).  Thus, an MRI of Plaintiff's left knee was taken on June 29, 2000.  It revealed a subtle tear of the medial meniscus; a cyst; and an attenuated ACL, compatible with a remote injury, but the ACL was not torn (Tr. 182).  A second MRI was taken on January 26, 2001.  The reviewing physician observed "some linear increased signal" and determined that it was probably a stable postoperative meniscus, although a possibility existed that it was a recurrent tear (Tr. 173).

*Records from Southern Orthopaedics and Sports Medicine, P.A. ("SOSM")* - Plaintiff was treated at SOSM from approximately July 11, 2000, to December 26, 2000, upon referral from Dr. Wilson.  Plaintiff described a "spontaneous onset of left knee pain" in approximately November 1999.  She stated she had been treated conservatively, but her pain continued.  Plaintiff decided to undergo a left knee arthroscopy (Tr. 145), which was performed on August 1, 2000 (Tr. 143).  The following impairments were observed:  1)  "tear posterior horn medial meniscus"; 2) "articular cartilage defect, i.e., chondromalacia, full thickness to grade II medial femoral condyle"; 3) "intrameniscal band left knee"; and 4) "full thickness grade II cartilage defect lateral tibial plateau" (Tr. 143, 141).  The following procedures were performed: 1) "subtotal medial meniscectomy left knee with medial femoral condyle chondroplasty and drilling"; 2) "resection of intrameniscal band and resection of fat pad and extensive synovectomy"; and 3) "lateral chondroplasty with drilling lateral tibial plateau" (*id.*).  After surgery, it was estimated that Plaintiff would be unable to work for three months and unable to weight-bear for six weeks (Tr. 141).  However, four weeks post-surgery, Plaintiff complained of significant pain and continued to ambulate "touch-down only using crutches" (Tr. 140).  Dr. Philip Benton noted that "the presence of pain is not accompanied by any significant other pathology."  He reassured Plaintiff and advised her to continue non-weightbearing for approximately three more months and to continue in physical therapy (Tr. 140).  Plaintiff

returned to SOSM on September 12, 2000, and advised that she fell two to three days earlier and heard a "popping sound" (Tr. 139). She went to the E.R. where x-rays were taken, but they showed no apparent fracture.  She claimed to be in pain all the time (*id.*).  A physical examination revealed full left knee extension, but some pain and tenderness. An MRI to "rule out internal derangement" (*id.*) was taken on or about September 13, 2000 (Tr. 138) and revealed a new tear to the posterior horn of the medial meniscus (*id.*).  On September 15, 2000, Plaintiff reported significant pain, "perhaps [even] worse than before [her] surgery," although Dr. Benton noted "her pain description seems slightly disproportionate" (Tr. 137).  On September 26, 2000, Plaintiff returned to SOSM and reported that her knee was not much better.  Dr. Benton noted that she "continues to demonstrate disproportionate pain with no significant correlating findings" (*id.*).  On October 24, 2000, Plaintiff made several requests for a disability letter and a request for her duty status at her job as a CNA. Dr. Benton advised Plaintiff to discontinue her use of crutches and to continue physical therapy.  He thought she could return to light duty work in mid-December, "advancing over a period of two months to full duty" (Tr. 135).  On December 5, 2000, Dr. Benton opined that Plaintiff could "return to full [work] duty on March 1, 2001" (Tr. 136).

*Report of Lawrence L. Prokop, D.O.* - At Dr. Wilson's request, Dr. Prokop performed a "complex consultation medical evaluation" on January 17, 2001 (*see* Tr. 161-63).  Plaintiff complained of "arthritis of the 'entire body'" (Tr. 161).  Dr. Prokop reviewed Plaintiff's past relevant medical records and conducted a physical examination.  He noted that Plaintiff refused to walk without her crutches and that she gave minimal effort throughout the examination of her left lower extremity, yet manual muscle testing revealed strength at the level of plus five out of five and equal bilaterally in the major and minor muscle groups of the upper and lower extremities (Tr. 163). Plaintiff "co-contracted" the left lower extremity to block testing, however, Dr. Prokop was able to accomplish the testing as she relaxed the co-contraction (*id.*).  His overall impression was: 1) history of degenerative joint disease, 2) symptom magnification syndrome, and 3) obesity (*id.*).

*Records from Ellen W. McKnight, M.D.* - Dr. McKnight first saw Plaintiff on April 3, 2001, for suspected arthritis, and "joint symptoms" experienced for the last nine to ten years (Tr. 267). Dr. McKnight concluded that Plaintiff had "possible inflammatory polyarthritis" and "persistent left knee pain," that is "multifactorial probably due to inflammatory arthritis and mechanical dysfunction of the knee" (Tr. 266).  Dr. McKnight recommended a full body scan, which was performed on April

9, 2001 (Tr. 266, 268).  The scan revealed "increased activity [to the] lateral left tibial plateau," but was otherwise negative (Tr. 268).  Plaintiff returned to Dr. McKnight's office on May 16, 2001, and reported continued left knee pain, the necessity of crutches due to the pain, and overall joint achiness (Tr. 265).  Plaintiff's medications were adjusted and she was advised to return to Dr. McKnight's office in three months and to notify Dr. McKnight if her symptoms worsened prior to that time (*id.*).  Plaintiff returned in January 2002, complaining of morning stiffness, mostly in her hands, but in other joints as well (Tr. 315).  Plaintiff told Dr. McKnight that the medication received on her last visit helped quite a bit (Tr. 316).  Plaintiff mentioned that Dr. Wilson thought she may suffer from Reiter's syndrome.  Dr. McKnight thought Reiter's was a possibility, however she was "leaning more towards seronegative rheumatoid arthritis."  Her overall impression was that Plaintiff had "probable inflammatory polyarthritis, most likely seronegative rheumatoid arthritis," and "persistent left knee pain" (*id.*).

*Records from Sacred Heart Hospital ("Sacred Heart") and/or Cordova Orthopaedic Associates ("COA")* - It appears that Plaintiff was first seen at COA on February 13, 2001, upon referral from Dr. Prokop, for left knee pain.  Plaintiff explained that she underwent knee surgery in August 2000, by Dr. Benton, but claimed she "never really did well after the surgery and had therapy for months without any avail" (Tr. 309).  Plaintiff said her knee was very painful and she needed crutches "just to get around" (*id.*).  X-rays revealed a "definite narrowing of the [left] patellofemoral joint" (*id.*).  Dr. Tappan was not sure what should be done, but thought exercise would help and that a patellectomy might be in order (Tr. 308).  He did note that Plaintiff had full range of motion in her left knee, but motion was painful (Tr. 309).  Plaintiff returned on March 6 and March 27, 2001.  At each visit, Dr. Tappan noted she was not doing any better.  He remained unsure of the appropriate treatment and decided to obtain an opinion from another physician (Tr. 308).  On April 17, 2001, Dr. Tappan concluded that a patellectomy was probably the best alternative if Plaintiff's patella looked as bad as he thought it would (Tr. 307).  The procedure was scheduled for April 25, 2001.  After the procedure commenced, Dr. Tappan determined, based upon the arthroscopic findings, that a patellectomy was not appropriate because Plaintiff had "intact articular cartilage on both sides of the patellofemoral joint," and that it was "particularly good looking" (Tr. 305).  Thus, he simply shaved the undersurface of Plaintiff's patella (Tr. 304-05).

Plaintiff returned to COA on May 1, 2001 (Tr. 307).  She had some pain, but was doing

reasonably well (*id.*).  X-rays were taken of her knees which revealed a patella baja on the left.  Dr. Tappan noted that he did not believe he had "ever seen one of these . . . before" (Tr. 303).  He recommended taking a "wait and see" approach, that Plaintiff do quad exercises, and, if her condition did not improve, possibly performing a procedure to lengthen her left patella (*id.*).  Plaintiff was reexamined on May 22, 2001.  Dr. Tappan noted no improvement and stated he "was leaning toward surgery because it doesn't look like she is going to get better and she has a significant anatomical problem" (Tr. 302).  Upon noting no improvement by July 5, 2001, the lengthening procedure was scheduled for July 11, 2001 at Sacred Heart (*id.*).

The surgery went well and Plaintiff's follow-up treatment was at COA.  She was seen there on July 24, 2001, and was "doing well" with "little pain" (Tr. 301).  On August 16, 2001, it was again noted that she was "doing well."  Her pain seemed "a lot better," and her patella appeared well aligned (*id.*).  On August 30, 2001, she was not experiencing "a great deal of pain" and did not need any pain medication (Tr. 310).  Dr. Tappan stated, "I should note that she can perform a quad set pretty well" (*id.*).  On September 27, 2001, she was "coming along nicely," felt a lot of relief from her pain, and was happy (*id.*).  In October 2001, it was noted that she was doing "very well" and had full extension of her knee (*id.*).  On January 29, 2002,  Dr. Tappan noted that Plaintiff's "knee is getting better all the time" (Tr. 312), although she was experiencing left shoulder pain.  X-rays of the left shoulder were "unremarkable" and Plaintiff  had full range of motion in the shoulder (*id.*).  She was given an intra-articular injection for the pain.  It appears that Plaintiff's last visit at COA was on March 18, 2002, at which time she advised Dr. Tappan that she was doing well and had a good result from the injection (312-13).  She declined another injection at that time, advising Dr. Tappan that she "could live with it" (Tr. 18, 313).  Dr. Tappan noted that "Plaintiff's knee is coming along and not hurting her very much" (Tr. 18-19, 313).  His impression was AC [acromioclavicular] joint arthritis (Tr. 312).  There is no evidence that Plaintiff ever returned to Dr. Tappan after this visit.

C.     Other Information Within Plaintiff's Claim File

*A Physical Residual Functional Capacity Assessment* form was completed by Mary Elizabeth Seay, M.D., on April 14, 2001 (Tr. 147-54).  Dr. Seay concluded that Plaintiff could occasionally[3]

---

[3]"Occasionally" means occurring from very little up to 1/3[rd] of an 8-hour workday (cumulative, not continuous).

lift and/or carry (including upward pulling) 20 pounds, frequently[4] lift and/or carry (including upward pulling) 10 pounds, and stand and/or walk and/or sit (with normal breaks) for about six hours in an eight-hour workday.  She also found Plaintiff had the unlimited ability, subject to the above restrictions, to push and/or pull (including operation of hand and/or foot controls).  She believed Plaintiff had frequent postural limitations (i.e., in her ability to climb, balance, stoop, kneel, crouch or crawl) because of pain (Tr. 149), but no visual, communicative, environmental, or manipulative limitations (i.e., to reach, handle, finger or feel) (Tr. 149-51).   Although the handwriting is hard to decipher, it appears that Dr. Seay based her findings, at least in part, upon the fact that Plaintiff's treating physician noted that she has "disproportionate pain" (Tr. 148) and that "symptom magnification seems prevalent" (Tr. 152).

Another RFC assessment form was completed by Robert L. Steele, M.D., on August 7, 2001 (Tr. 279-86).  Dr. Steele concluded that Plaintiff could occasionally lift and/or carry (including upward pulling) 20 pounds, frequently lift and/or carry (including upward pulling) 10 pounds, and stand and/or walk and/or sit (with normal breaks) for about six hours in an eight-hour workday.  He also found Plaintiff had the unlimited ability, subject to the above restrictions, to push and/or pull (including operation of hand and/or foot controls).  He believed Plaintiff had occasional postural limitations (i.e., in her ability to climb, balance, stoop, kneel, crouch or crawl) because of knee pain (Tr. 281), but no visual, communicative, environmental, or manipulative limitations (i.e., to reach, handle, finger or feel) (Tr. 282-83).  Dr. Steele based his findings, at least in part, upon a finding that Plaintiff's symptoms were credible.  Additionally, he believed her RFC was reduced to "light" because of knee pain, however he thought her surgery on July 11, 2001 "seems to have improved [her] situation" (Tr. 284).

V.     DISCUSSION

Plaintiff contends that the ALJ erroneously: 1) rejected the opinions of Dr. Wilson, Plaintiff's treating physician; 2) failed to fully and fairly develop medical evidence; 3) discredited Plaintiff's subjective testimony; and 4) used the grids instead of obtaining testimony from a vocational expert.

A.     Treating Physician's Opinion

Dr. Wilson opined in April 2002 that Plaintiff could not work because of multiple medical

---

[4]"Frequently" means occurring 1/3rd to 2/3rds of an an 8-hour workday (cumulative, not continuous).

problems, including rheumatoid arthritis, fibromyalgia, Reiter's syndrome, significant hypertension, and COPD (Tr. 318).  His opinion regarding her inability to work is also reflected in a Physical Capacities Evaluation completed in May 2002 (Tr. 334-35).  The ALJ dismissed Dr. Wilson's opinions and gave several reasons for doing so.  Plaintiff contends, however, that the reasons are "plainly inadequate, and certainly do not provide the requisite good cause" (Doc. 13 at 6).

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See* Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See* Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20

C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

Here, the ALJ rejected Dr. Wilson's opinion because it "conflicts with the evidence as a whole and it even conflicts with his own records" (Tr. 19).  The ALJ correctly noted that Dr. Wilson treated Plaintiff for many illnesses, but referred her to Dr. Benton, an orthopaedic surgeon at SOSM, when she complained of knee pain.  As noted by the ALJ, Dr. Benton's records show that Plaintiff improved following surgery and Plaintiff was released to return to full duty on March 1, 2001, less than twelve months from August 1, 2000, Plaintiff's alleged onset of disability.[5]  Additionally, Dr. Benton noted that Plaintiff's pain description was disproportionate and did not correlate with other findings.  Regarding Plaintiff's arthritis, the ALJ correctly noted that Dr. Wilson referred Plaintiff to a specialist, Dr. McKnight, and that Dr. McKnight did not definitively diagnose Plaintiff with rheumatoid arthritis.  Additionally, the ALJ accurately noted that no one other than Dr. Wilson diagnosed Plaintiff with COPD.  In fact, upon referral to Dr. Stringfield it was determined that "no good evidence of primary pulmonary disease" existed.  Furthermore, as noted by the ALJ, Dr. Stringfield determined that Plaintiff had suffered from a pulmonary infection which caused her to cough, but Plaintiff never returned to Dr. Stringfield for follow-up testing as advised.  Finally, the ALJ noted that "both of the State Agency physicians [Dr. Seay and Dr. Steele] and Dr. Benton found that [Plaintiff] could perform light work activity" (Tr. 20).  A review of Dr. Seay and Dr. Steele's RFC assessments supports the ALJ's finding.  Similarly, Dr. Benton's records support the ALJ's finding.  As noted above, Dr. Benton believed Plaintiff could return to full work duty on March 1, 2001.  Although the ALJ stated that Dr. Benton found Plaintiff could perform *light duty*, Dr. Benton actually believed Plaintiff was capable of performing *more than* light work activity, as he thought she could return to "light duty work" in December 2000, but to "full duty" work as a CNA in March 2001 (*see* Tr. 135-37).

---

[5]A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of *not less than 12 months*."  42 U.S.C. § 423(d)(1)(A) (emphasis added).

Contrary to Plaintiff's suggestion, the ALJ had good cause for rejecting Dr. Wilson's opinions. Those opinions are conclusory, and are inconsistent with other substantial evidence in the record. Thus, the ALJ did not err.

B.      Developing the Record

Plaintiff contends that if the ALJ reasonably perceived a conflict between Dr. Wilson's opinions and the other evidence, he should have done more before rejecting those opinions (Doc. 13 at 5). Specifically, Plaintiff asserts that the ALJ should have recontacted Dr. Wilson for clarification as required by the regulations.

The Social Security disability benefits process is inquisitorial rather than adversarial. Sims v. Apfel, 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), Crawford & Co. v. Apfel, 235 F.3d 1298, 1304 (11th Cir. 2000), and is informal. Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1971); Kendrick v. Shalala, 998 F.2d 455, 456 (7th Cir. 1993); 20 C.F.R. 404.900(b). With informality comes a duty to develop a complete record as is done by European magistrates. Id. It is well established in the Eleventh Circuit that the ALJ has an affirmative duty to develop a full and fair record, which exists whether or not the plaintiff is represented by counsel. Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); Lucas v. Sullivan, 918 F.2d 1567, 1573 (11th Cir. 1990); Smith v. Bowen, 792 F.2d 1547, 1551 (11th Cir. 1986); Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).

Here, Plaintiff specifically alleges that the ALJ failed to develop the record as required by 20 C.F.R. § 404.1512(e)(1), which states that the ALJ should recontact the treating physician when the treating physician's report "contains a conflict or ambiguity that must be resolved . . . ." However, section 404.1512(e)(1) must be read in conjunction with section 404.1512(e), which states "when the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision." Thus, the treating physician need only be recontacted if the existing evidence is inadequate for a determination. Norman v. Apfel, 100 F.Supp.2d 1352 (N.D.Ga. 2000), cited by Plaintiff in support of her argument, is inapposite. There the ALJ erred by failing to recontact plaintiff's treating physician before sending her out for two consultative examinations. The court concluded, "once it was determined that additional information was necessary to decide her claim, the ALJ was required to first attempt to obtain this additional information from her

treating physician." Norman, 100 F.Supp. 2d at 1353.  Here, contrary to Plaintiff's assertion, the ALJ had no need to obtain additional information, such as recontacting Dr. Wilson or sending Plaintiff for a consultative examination, because ample information existed in Plaintiff's file upon which the ALJ could base a decision.  As noted previously, Dr. Wilson referred Plaintiff to numerous specialists, many of whom conducted physical examinations of Plaintiff, which included range of motion testing (Dr. Tappan) and observation of Plaintiff's gait (Drs. Benton, Prokop).  Thus, a consultative examination was not necessary.

C.      Discrediting of Plaintiff's Testimony

Plaintiff contends the ALJ failed to apply the Eleventh Circuit's three-part pain standard and improperly discredited her testimony concerning pain, including her testimony that she could never get off of her crutches or a cane and that her pain greatly interfered with her ability to perform daily activities.

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  Accord 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, supra, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard

is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)). However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered. Id.; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the Plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . . Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor v. Bowen, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, ... the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[6]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all

---

[6]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  Hand, *supra*, at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence."  Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

Here, the ALJ specifically found that Plaintiff's "allegations regarding her limitations are not credible to the extent all work activity would be precluded" (Tr. 21).  In support, the ALJ detailed evidence within the record.

First, the ALJ considered evidence suggesting that Plaintiff exaggerated her symptoms and limitations (Tr. 16).  In Sellers v. Barnhart, 246 F.Supp.2d 1201, 1213 (M.D. Al. 2002), the court found that plaintiff's malingering constituted substantial evidence upon which the ALJ could base his decision to discredit the subjective complaints of pain.  *See also* Jones v. Callahan, 122 F.3d 1148, 1152 (8th Cir. 1997) (an ALJ may properly consider a claimant's exaggeration of symptoms in evaluating her subjective complaints); Jenkins v. Bowen, 861 F.2d 1083, 1086 (8th Cir. 1988).  The ALJ discussed Dr. Prokop's examination of Plaintiff on January 17, 2001, when Dr. Prokop noted that Plaintiff refused to walk without her crutches, although Plaintiff reported she could bathe and dress herself, wash dishes, fold clothes and drive (Tr. 17, 155-63).  Additionally, Dr. Prokop's physical examination revealed that Plaintiff could walk with a normal heel toe gait on the right and with an antalgic limp on the left (Tr. 16, 162), and could walk on her heels within normal limits on the right, but held the left foot off the floor with foot dorsiflexed (*id.*).  She could walk on her toes within normal limits on the right, but held her left foot off the ground (*id.*).  She gave minimal effort throughout examination of the left lower extremity, yet had strength at the level of plus five out of five and equal bilaterally in the major and minor muscle groups of the upper and lower extremities (Tr. 16, 163).  She co-contracted the left lower extremity to block testing, however, Dr. Prokop was able to accomplish the testing as she relaxed the co-contraction (Tr. 16, 163).  Finally, the ALJ noted Dr. Prokop's impression of symptom magnification syndrome (Tr. 16, 163).  The ALJ also noted Dr. Benton's finding of "disproportionate pain with no significant correlating findings" (Tr. 15).

Second, the ALJ considered Plaintiff's daily activities in making a credibility determination.[7] The ALJ concluded that Plaintiff's daily activities were consistent with his finding that Plaintiff could perform sedentary work (Tr. 20).  Plaintiff testified that after her son went to school, she went to her mother's house where she spent her days sitting around (Tr. 371-72).  She drove about twenty-five miles a week, mostly to her mother's house and the grocery store (Tr. 372).  Plaintiff also testified that she used motorized carts at the grocery store when she went shopping with her husband (Tr. 372-73).  She was able to cook if she did not have to stand there and continuously watch the food (Tr. 376).  Although Plaintiff denied doing any significant level of housework, she did testify that she could do laundry with the help of her son and that she did some vacuuming in her home with a self-propelled vacuum (Tr. 20, 376).

Furthermore, the objective medical evidence does not support Plaintiff's allegation of disability during the relevant period.  Progress notes from Plaintiff's treating physicians in the months just before the ALJ hearing are particularly instructive.  Plaintiff saw Dr. Wilson on January 10 and 21, 2002 (Tr. 329-31).  Those progress notes reflect complaints of recurrent urinary tract infections, hypertension, swelling of the hands, and arthralgia (Tr. 329-31).  Dr. Wilson's progress notes also show that Plaintiff was referred to Dr. McKnight, a rheumatologist, on January 22, 2002 (Tr. 17, 315-17).  Dr. McKnight noted that Plaintiff had normal abduction and adduction of the shoulders and trace synovitis in the elbows, wrists, and hands (Tr. 17, 316).  Her impression was probable inflammatory polyarthritis and persistent left knee pain (Tr. 17, 316).  Plaintiff told Dr. McKnight that the Medrol dosepak given to her on her last visit was helpful (Tr. 315-16).  "If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  Roth v. Shalala,  45 F.3d 279, 282 (8th Cir. 1995), quoting Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993).  Dr. McKnight advised Plaintiff to continue her medication and return in two months (Tr. 17, 316).  Dr. McKnight also noted that she was "leaning more towards seronegative rheumatoid arthritis," however, the record does not show that Plaintiff ever returned to Dr. McKnight for follow up on that provisional diagnosis (Tr. 17, 316).  On January 29, 2002, Plaintiff saw Dr. Tappan who noted that "her knee is getting better all the time" (Tr. 312).  Plaintiff returned on March 18, 2002 and advised Dr. Tappan that she was doing well (Tr. 18, 312-13).  Dr. Tappan noted that "Plaintiff's

---

[7]Consideration of daily activities is proper.  *See* 20 C.F.R.§§ 404.1529, 416.929; Social Security Ruling (SSR) 96-7p.

knee is coming along and not hurting her very much" (Tr. 18-19, 313).  His impression was AC [acromioclavicular] joint arthritis (Tr. 312).  There is no evidence that Plaintiff ever returned to Dr. Tappan after March 2002.

The ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole.  *See* Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir.1996); Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996), *see also* McCray v. Massanari, 175 F.Supp. 2d 1329, 1338 (M.D. Ala. 2001).  Here the ALJ correctly noted that the medical evidence of record did not support Plaintiff's testimony that she had been diagnosed with rheumatoid arthritis (Tr. 19, 316, 381-82).  Additionally, although Plaintiff testified that she needed to elevate her leg above heart level to control swelling and pain, the medical evidence does not show that she ever discussed this with a doctor or that any doctor had recommended this measure (Tr. 384).  The ALJ is entitled to consider inconsistencies between a claimant's testimony and evidence of record.  This suggests that Plaintiff's elevation of her leg was due to choice rather than medical necessity.  *See* Hinkle v. Callahan, 963 F. Supp. 1533, 1546 (W.D. Mo. 1997) (medical evidence did not support plaintiff's claim that he was required to lie down and rest during the day).  Because Plaintiff failed to be a credible witness, the ALJ was not bound to give controlling weight to her subjective complaints. *See* 20 C.F.R. §§ 404.1529, 416.929; Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987).  The ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's testimony, and because his credibility finding is supported by substantial evidence on the record as a whole, his credibility finding should be affirmed.  *See* Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).


D.      Use of the Grids

Plaintiff contends the ALJ erred in failing to obtain the testimony of a VE regarding the existence of other work consistent with her RFC.

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Foote, 67 F.3d at 1558; Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the

Medical-Vocational Guidelines, also known as the grids.  Foote, 67 F.3d at 1558.  Exclusive reliance on the grids is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); Foote, 67 F.3d at 1559; Heckler v. Campbell, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, i.e., impairments that place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills."  Walker v. Bowen, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Foote, 67 F.3d at 1559; Chester v. Bowen, 792 F.2d 129, 132 (11th Cir. 1986); see also MacGregor v. Bowen, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Allen, 880 F.2d at 1202; Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981), overruled on other grounds.

It is the opinion of the undersigned that the ALJ's use of the grids was proper.  First, the ALJ found that Plaintiff "is capable of performing a full range of sedentary work" (Tr. 19),[8] and based his finding upon medical records in the file, including those of Doctors Benton and Tappan (Tr. 18-19).  As previously noted, Dr. Benton unequivocally contended Plaintiff was capable of more than sedentary work.  Additionally, although Dr. Tappan was not asked for an opinion concerning Plaintiff's ability to perform work, he did note Plaintiff's continued progress after surgery, lack of significant pain, and her ability to do a quad set "pretty well."  Thus, the ALJ's finding that Plaintiff

---

[8] 20 C.F.R. § 404.1567 defines sedentary work as follows:
(a) Sedentary work. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

could perform a full range of sedentary work is well supported by the record, and, because Plaintiff could perform a full range of work at that given level, use of the grids was appropriate. *See* Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir.1985) (grids inappropriate if limitations prevent a wide range of gainful employment at the designated level). Second, although use of the grids is inappropriate in cases involving non-exertional impairments, such as pain, *see* Cowart v. Schweiker, 662 F.2d 731, 736 n.1 (regulations do not apply in cases where claimant alleges nonexertional kinds of impairments), here Plaintiff's allegations of pain were properly discredited by the ALJ. Third, Plaintiff argues that her "use of an assistive device [i.e., crutches or a cane] should have prevented use of the grids" (Doc. 13 at 13). However, Plaintiff's use of a cane was not medically necessary, as is evident from a review of the file, including Dr. Prokop's observation that Plaintiff refused to walk without crutches, gave minimal effort during her examination, and co-contracted her leg to block testing (i.e, "symptom magnification syndrome"), as well as Dr. Benton's finding of "disproportionate pain" and his advice that Plaintiff discontinue her use of crutches (Tr. 135). Accordingly, the ALJ did not err in his use of the grids.

VI.    Conclusion

Plaintiff has failed to show that the ALJ erred in making his findings, or that any other ground for reversal exists. Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 22nd day of July, 2005.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**